**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**September 3, 2020**

# In the Court of Appeals of Georgia

A20A0915. DIPIETRO v. THE STATE.

GOBEIL, Judge.

A Fulton County jury found Robert DiPietro guilty of a single count of child molestation involving his step-daughter, A. S.[1] DiPietro filed a motion for new trial, which the trial court denied following a hearing. In his instant appeal, DiPietro argues that: (1) his trial counsel rendered ineffective assistance by failing to object to testimony from one of the State's experts, which improperly bolstered the credibility of the victim; (2) his trial counsel rendered ineffective assistance by failing to object to the trial court's ruling that the defense only had one hour to present closing argument, in violation of OCGA § 17-8-73; and (3) the trial court erred in concluding

---

[1] The jury acquitted DiPietro of rape and two additional counts of child molestation.

that the victim (now an adult) can "reassert" the mental health privilege (waived by the victim's mother while the victim was still a minor), thereby preventing the defense from introducing the victim's mental health records at trial. For the reasons that follow, we affirm.

> On appeal from a criminal conviction, the evidence must be viewed in the light most favorable to support the verdict, and the defendant no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility.

*Williams v. State*, 333 Ga. App. 879, 879 (777 SE2d 711) (2015) (citation and punctuation omitted). So viewed, the evidence shows that shortly after A. S.'s parents divorced in 2005, her mother started dating DiPietro. A. S. initially thought that DiPietro was "great," because he was nice to her mother and "charming," and A. S. had a "really good relationship" with him. A. S.'s mother broke up with DiPietro after A. S., her mother, and her brothers moved to Florida. A. S. and her family moved back to Georgia when she was in sixth grade. A. S.'s mother and DiPietro resumed their relationship and got married without telling A. S., and the family moved into a house together in Roswell.

While still in middle school, A. S. experimented with marijuana after finding some in her biological father's car. In the summer of 2012, when A. S. was 14 years old, she smoked marijuana with DiPietro about three or four times a week, and he would give her cigarettes. A. S. did not tell her mother about this. DiPietro also allowed A. S. to drive his car. A. S. trusted DiPietro, talked to him "about everything," including "private stuff," and thought of him as her best friend. DiPietro did the laundry at the house and remarked to A. S. that her thong underwear was "cute" and "sexy," which made her feel uncomfortable. On occasion, when A. S. and DiPietro were playing a board game or driving in the car, DiPietro would rub her legs, or grab her by the back of her neck and kiss her, telling her that he loved her. DiPietro frequently inquired as to whether A. S. was sexually active.

On the evening of September 17, 2012, DiPietro and A. S. smoked marijuana together. Early the next morning, September 18, after A. S.'s mother left for work, DiPietro entered A. S.'s bedroom and asked her if he could lay in bed with her. A. S. pretended to be asleep as DiPietro crawled into her bed and cradled her, while caressing her leg and back, kissing her neck, and telling her he loved her. A. S. did not tell DiPietro to stop, but she buried her head into her pillow and cried. When A. S.'s dog started barking, DiPietro left A. S.'s room. A. S. told a school friend about

3

what had happened, but did not want to tell anyone else because she was embarrassed. That night, A. S. and DiPietro smoked marijuana together, and DiPietro gave A. S. a Xanax pill because she was experiencing some anxiety. A. S. then went to her bedroom and put a desk in front of her door "so nothing would happen like the morning before again."

The next morning, September 19, A. S. awoke to the sound of someone trying to break into her bedroom. A. S. "was pretty out of it . . . from the Xanax thing." DiPietro then got into A. S.'s bed, caressed her leg and touched "everything on [her] body," including her chest, stomach, and the top of her thigh. He also kissed A. S.'s neck and told her he loved her. A. S. cried into her pillow. DiPietro then pulled down A. S.'s leggings, flipped her over on her stomach, and started rubbing her vagina with his hand. DiPietro penetrated A. S.'s vagina with an unknown object, which caused her pain. DiPietro also put his mouth on A. S.'s vagina and performed oral sex. The whole incident lasted approximately 45 minutes to an hour.

A. S. got up, took a shower, and called a friend to come and pick her up. A. S. went to her friend's house and told her friend's mother that DiPietro had raped her. Her friend's mother convinced A. S. to report the incident to A. S.'s biological father. After A. S. told her father, they went to the police station to file a report. After

4

meeting with the police, A. S. was taken to the hospital for a medical examination. A. S.'s father then drove A. S. to her mother's home, where A. S. collected the clothing she had been wearing during the incident, including her leggings, bra, and sweatshirt, which were given to the police.

The GBI examined the leggings and located two stains in the crotch/thigh area, which indicated the possible presence of seminal fluid. Testing on the larger of the two stains from the crotch area of the leggings revealed the presence of both A. S.'s and DiPietro's DNA. A. S. underwent a forensic interview on September 26, 2012, in which she reported that DiPietro molested her in two different incidents occurring on consecutive days, September 18 and 19.

Based on the foregoing, a grand jury returned an indictment, charging DiPietro with rape (Count 1), and three counts of child molestation (Counts 2-4).[2] At trial, DiPietro testified in his own defense and denied that he got into A. S.'s bed on the morning of September 18, or that he touched her in a sexually inappropriate manner. He also denied having sexual intercourse with A. S. on September 19, rubbing her legs or torso for the purpose of sexual gratification, or placing his mouth on her

[2] A. S.'s mother also was charged with a single count each of cruelty to children in the second degree (Count 5) and reckless conduct (Count 6). She entered an *Alford* plea to the reckless conduct charge prior to the start of Di Pietro's trial.

5

vagina. DiPietro further denied smoking marijuana with A. S., or giving her Xanax on the evening of September 18. The defense introduced several character witnesses, who testified that they considered DiPietro to be a honest person, and that he does not act in a sexually inappropriate manner with minors. Additionally, the defense also called several witnesses, including A. S.'s brother, and these witnesses testified that A. S. is not honest and is prone to manipulation.

Following the charge conference, the trial court explained to the jury that both sides are typically limited to one hour for closing arguments. The jury found DiPietro guilty of one count of child molestation (Count 3), but acquitted him of the remaining counts. The trial court sentenced DiPietro to a term of twelve years with the first seven years in confinement and the remainder on probation. DiPietro filed a motion for new trial, which the trial court denied following a hearing. The instant appeal followed.

1. DiPietro does not dispute that the evidence is sufficient to sustain his conviction for child molestation, but we nevertheless have independently reviewed the record, with an eye toward the legal sufficiency of the evidence. We conclude that the evidence adduced at trial was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Di Pietro was guilty of the crime of which he

was convicted. *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

OCGA § 16-6-4 (a) (1) defines child molestation as "any immoral or indecent act [done] to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person[.]" As relevant here, Count 3 of the indictment charged that on September 19, 2012, DiPietro "did unlawfully commit an immoral and indecent act to, with and in the presence of [A. S.], a child under the age of sixteen (16) years, by rubbing said child's legs, with the intent to arouse and satisfy accused's sexual desires[.]" At trial, A. S. described that on the morning of September 19, DiPietro came into her room and then got into her bed, caressed her leg and touched "everything on [her] body," including her chest, stomach, and the top of her thigh. This evidence was sufficient to sustain Di Pietro's child molestation conviction. See *Smith v. State*, 320 Ga. App. 408, 410 (1) (a) (740 SE2d 174) (2013) ("The testimony of a victim of child molestation or aggravated child molestation need not be corroborated. The testimony of one witness is generally sufficient to establish a fact.") (citations and punctuation omitted); *Howard v. State*, 319 Ga. App. 621, 622-623 (737 SE2d 722) (2013) (victim's testimony that defendant rubbed his hand on her leg, put his hand under her shorts

7

and underwear, and touched her genital area was sufficient to support his conviction for child molestation).

2. DiPietro asserts that he received ineffective assistance of trial counsel.[3] To prevail on this claim, DiPietro "must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance." *Brewer v. State*, 301 Ga. 819, 821 (3) (804 SE2d 410) (2017) (citing *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984)). If an appellant fails to satisfy either prong of this test, we need not examine the other prong. *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012).

> (W)hile other counsel, had they represented [DiPietro], may have exercised different judgment, the fact that trial counsel chose to try the case in the manner in which it was tried, and made certain difficult decisions regarding the defense tactics to be employed with which [DiPietro] . . . [later disagreed], does not require a finding that the representation below was so inadequate as to amount to a denial of effective assistance of counsel.

---

[3] DiPietro's defense team consisted of two attorneys. For ease of reference, the term "trial counsel" in this opinion refers to both attorneys.

*Reed v. State*, 285 Ga. 64, 66-67 (6) (673 SE2d 246) (2009) (citations and punctuation omitted). Rather, to show deficient performance, "[DiPietro] must demonstrate that counsel's performance was not reasonable under the circumstances confronting counsel at the time, without resorting to hindsight." *Belton v. State*, 270 Ga. 671, 673 (3) (512 SE2d 614) (1999) (citations and punctuation omitted). In reviewing counsel's performance on appeal, "we must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Hardin v. State*, 344 Ga. App. 378, 381 (1) (810 SE2d 602) (2018) (citation and punctuation omitted).

(a) DiPietro asserts that his trial counsel was ineffective by failing to object to testimony from Anique Whitmore, one of the State's experts, which improperly bolstered A. S.'s credibility.

At trial, Whitmore, an expert in the fields of forensic interviewing as well as the psychology of sexual abuse, testified that although she did not perform A. S.'s forensic interview,[4] she had reviewed the recording of the interview, as well as the interviewer's notes, and formed her opinions based on that. Specifically, Whitmore stated that she was not "a huge fan" of the forensic interview and opined that it

---

[4] The forensic interviewer also testified at trial.

"doesn't sound very professional." DiPietro's claim of improper bolstering is based on the following exchange between the trial court and Whitmore with respect to a question from the jury:

> [COURT]: Ms. Whitmore, within the field of forensic interviewing for which you've been qualified as an expert is there training to detect false narratives or false accusations?
>
> [EXPERT]: There is.
>
> [COURT]: In your review of the forensic interview between [the interviewer] and [A. S.] were there any cues along those lines that you were able to observe?
>
> [EXPERT]: I did not. I did not observe any.
>
> [COURT]: Okay.

A short time later, the following exchange occurred during the State's re-direct examination of Whitmore:

> [STATE]: I also want to talk about one of the juror's questions about your training to, you know, detect the red flags or indicators for false allegations. Specifically[,] talk to the jury about suggestibilities,

10

coaching, and some of those other things that as a practitioner you're aware of in your training.

[EXPERT]: . . . . The more experience you have the more proned you are to seeing the red alerts when it comes to perhaps an alleged victim lying or fabricating something. . . .

[STATE]: And in your review of this case, did you have any sort of red flags or indicators along the lines of the question that the jurors posed?

[EXPERT]: I did not, no.

On appeal, DiPietro asserts that Whitmore improperly bolstered the victim's credibility by commenting on whether Whitmore believed A. S. was telling the truth. According to DiPietro, because the State's case rested on the victim's credibility, trial counsel's failure to object to the contested testimony unduly prejudiced him and resulted in the jury finding him guilty.

The credibility of a witness is an issue for the trier of fact. OCGA § 24-6-620. Thus, "[a] witness's credibility is exclusively a matter for the jury, and in no circumstance may a witness's credibility be bolstered by the opinion of another, even an expert, as to whether the witness is telling the truth." *Pack v. State*, 335 Ga. App. 783, 787 (3) (783 SE2d 146) (2016) (citation and punctuation omitted). See *Patterson*

11

*v. State*, 278 Ga. App. 168, 172 (628 SE2d 618) (2006) (an expert witnesses may not testify to truthfulness or credibility, and attacking a witness's credibility does not "open the door" to such testimony). However, expert opinion testimony "that bolsters the credibility of the indicted allegations of sexual abuse" is not inadmissible on the ground that it indirectly reflects positively on the victim's credibility. *Odom v. State*, 243 Ga. App. 227, 227-228 (1) (531 SE2d 207) (2000). See *Harris v. State*, 330 Ga. App. 267, 273 (2) (765 SE2d 369) (2014) ("[A]n expert witness may testify as to the existence of certain typical patterns of behavior exhibited by victims of rape, as long as the jury [is] permitted to draw for itself the final conclusion as to whether the victim in the case at hand was raped[.]") (citation and punctuation omitted). Rather,

> [w]hat is forbidden is expert opinion testimony that directly addresses the credibility of the victim, i.e., "I believe the victim; I think the victim is telling the truth," or expert opinion testimony that implicitly goes to the ultimate issue to be decided by the jury, when such issue is not beyond the "ken" of the average juror, i.e., "In my opinion, the victim was sexually abused."

*Odom*, 243 Ga. App. at 228 (1) (citations and punctuation omitted). See *Jackson v. State*, 330 Ga. App. 108, 116 (4) (e) (766 SE2d 558) (2014) (accord).

12

Here, the State's expert, Whitmore, did not directly comment on the victim's credibility, nor did she opine on the ultimate issue of whether DiPietro improperly touched A. S. Rather, Whitmore simply stated that she did not see any red flags indicating deception or fabrication during the forensic interview, thereby leaving the issue of the victim's credibility in the exclusive province of the jury. See *Anthony v. State*, 282 Ga. App. 457, 459 (2) (638 SE2d 877) (2006) (counsel not ineffective for failing to object to testimony that victim did not exhibit any behaviors indicative of deception during interview). Accordingly, Whitmore's testimony was not improper as alleged, and DiPietro's trial counsel necessarily was not ineffective by failing to object to its admission. See *Jackson*, 330 Ga. App. at 117 (4) (e) ("Failure to make a meritless objection cannot be evidence of ineffective assistance.") (citation and punctuation omitted).

(b) DiPietro argues that trial counsel rendered ineffective assistance by failing to recognize that counsel was entitled to two hours of closing argument. He highlights that OCGA § 17-8-73 allows for a two-hour closing in cases, such as here, where the defendant is charged with a capital crime, such as rape.[5] DiPietro maintains that he

---

[5] See OCGA §§ 17-8-73 ("In felony cases other than those involving capital felonies, counsel shall be limited in their closing arguments to one hour for each side. In cases involving capital felonies, counsel shall be limited to two hours for each

13

was prejudiced by his counsel being erroneously limited to one hour as this "denied [DiPietro] his critical right to present a full, robust closing argument that included a discussion of the critical points of law applicable to the case."

At trial, both the State and DiPietro's trial counsel indicated that they might need more than an hour for closing. The trial court responded that it was "not going to interrupt anyone," but it would keep both closings "as close to an hour as is reasonable." The court then informed the jury that both sides are typically limited to one hour for closing arguments. DiPietro's counsel did not object to this statement. The court continued:

> Both sides have said could we maybe have a little bit more and I've said maybe. I'll let them know when it's been an hour. But as you know, perhaps better than anyone else, this has been a long trial and so the attorneys are working hard to fit it all into that hour. So I'll be letting them know when that hour is up and we'll try to wrap it up soon after that.

---

side."); 16-6-1 (b) ("A person convicted of the offense of rape shall be punished by death, by imprisonment for life without parole, by imprisonment for life, or by a split sentence that is a term of imprisonment for not less than 25 years and not exceeding life imprisonment, followed by probation for life.").

During closing arguments, the trial court alerted DiPietro's trial counsel after he had reached the one-hour mark. Counsel then provided some additional remarks and concluded his presentation.

At the motion for new trial hearing, trial counsel testified that he could not recall whether he was aware that he was entitled to two hours of closing argument at trial, pursuant to OCGA § 17-8-73. Nevertheless, counsel stated that he "needed more time" during closing arguments, as the case was "fact-intensive" and he had close to 200 slides to present, and he did not have the opportunity to discuss the applicable law. Counsel confirmed that had he known that he was entitled to two hours for closing, he would have pointed that out to the trial court.

Assuming DiPietro was entitled to two hours for a closing argument and his trial counsel was deficient in failing to recognize this right,[6] DiPietro has failed to

[6] In its response brief, the State argues that "[t]here is considerable doubt whether [counsel] was entitled to a two-hour closing[,]" as rape is no longer considered a capital offense for sentencing purposes. "In *Coker v. Georgia*, 433 U. S. 584 (97 SCt 2861, 53 LE2d 982) (1977), the United States Supreme Court held that the death penalty can no longer be imposed for rape under the Eighth Amendment to the U. S. Constitution." *Peek v. State*, 239 Ga. 422, 428 (5) (238 SE2d 12) (1977). "In *Collins v. State*, 239 Ga. 400, 402 (2) (236 SE2d 759) (1977), [the Supreme Court of Georgia] applied the rationale of *Coker* to armed robbery and kidnapping, holding that the death penalty may no longer be imposed for these crimes either." Id. Nevertheless, our caselaw continues to treat kidnapping and armed robbery as capital felonies for purposes of OCGA § 17-8-73. See, e.g., *Hammond v. State*, 303 Ga. App.

15

show harm. See *Hammond v. State*, 303 Ga. App. 176, 179 (1) (692 SE2d 760) (2010) ("in situations when defense counsel's closing was improperly limited, defendants . . . were required to show affirmatively that they were prejudiced by their counsel's performance). At the motion for new trial hearing, trial counsel explained that he needed additional time to include a presentation of the relevant law and how the facts applied to the law. Counsel specifically testified he did not have time to explain to the jury the importance of witness credibility, including changing stories, as well as the credibility of expert witnesses.

"The issue is whether, but for the erroneous denial of the extra hour, a reasonable probability exists that [DiPietro's] counsel could have argued some point from which the jury would have concluded that he was innocent of the charges against him." *Hammond*, 303 Ga. App. at 180 (1). Based on the evidence presented at trial, including the victim's testimony, as well as the DNA evidence tying DiPietro

---

176, 176 (1) (692 SE2d 760) (2010) ("[b]ecause the maximum punishment for kidnapping with bodily injury includes the death penalty . . . [the defendant] was entitled to a two-hour closing argument"); *Johnson v. State*, 309 Ga. App. 655, 656 (2) (710 SE2d 857) (2011) (treating armed robbery as a capital offense for purposes of OCGA § 17-8-73 analysis). See also *Monroe v. State*, 272 Ga. 201, 202 (2) (528 SE2d 504) (2000) (for the purposes of OCGA § 17-8-73, malice murder and felony murder are capital felonies even when the death penalty is not sought). Based on existing precedent, therefore, it appears that DiPietro's trial counsel was entitled to two hours for his closing argument.

to the crime, we find that no such probability existed. Id. Moreover, as the trial court stated in its order denying DiPietro's motion for new trial, the "closing was enough to persuade the jury that the State had failed to meet its burden as to all other counts in the indictment. [Nor did DiPietro explain] how the remaining minutes would have been surgically – and clairvoyantly – targeted at the lone count for which the jury convicted [him]." See *Powell v. State*, 272 Ga. App. 628, 630 (2) (612 SE2d 916) (2005) (explaining that the jury's acquittal on some charges against a defendant strongly supports the conclusion that trial counsel rendered "reasonably effective assistance[.]") (citation and punctuation omitted). Therefore, this claim of ineffective assistance is without merit.

3. DiPietro argues that the trial court erred in barring the defense from introducing the victim's mental health records, which the victim's mother had released to the defense, into evidence at trial through expert testimony.

The court conducted a preliminary hearing to determine the admissibility of evidence of A. S.'s mental health at the time of the outcry, which the defense sought to introduce to undermine her credibility and the reliability of her account of the allegations involving DiPietro. A. S.'s mother obtained A. S.'s records for mental health treatment from two institutions at the time the victim was still a minor, as well

17

as some notes from her pediatrician and school records. The mother in turn handed over the records to defense counsel who shared them with a defense expert. The trial court ruled that A. S., now an adult, could assert the privilege with respect to the records for herself, which she did. DiPietro challenges this ruling on appeal.

"Georgia law provides several privileges related to mental health, which, collectively, are referred to as the 'mental health privilege.'" *Brown v. Howard*, 334 Ga. App. 182, 185 (1) (778 SE2d 810) (2015), citing *State v. Herendeen*, 279 Ga. 323, 325 (613 SE2d 647) (2005); OCGA § 24-5-501 (a) (5). "The primary purpose of the [mental health] privilege is to encourage the patient to talk freely without fear of disclosure and embarrassment, thus enabling the psychiatrist to render effective treatment of the patient's emotional or mental disorders." *Cooksey v. Landry*, 295 Ga. 430, 432 (2) (761 SE2d 61) (2014) (citation and punctuation omitted).

An appellate court generally reviews for an abuse of discretion the application of a privilege. *Gwinnett Hosp. System, Inc. v. Hoover*, 337 Ga. App. 87, 88 (785 SE2d 918) (2016). See *Wiles v. Wiles*, 264 Ga. 594, 598 (2) (448 SE2d 681) (1994) (applying abuse of discretion standard to review trial court's ruling that patient was entitled to the benefit of the mental health privilege).

18

There is no Georgia case law that directly addresses whether the mental health privilege, after being waived by a minor's parent or guardian, can be "reasserted" by the victim after he/she reaches the age of majority. Our existing precedent makes clear that "[i]n the absence of a waiver by the patient,[7] privileged material is neither discoverable nor admissible at trial[.]" *Advantage Behavioral Health Systems v. Cleveland*, 350 Ga. App. 511, 519 (3) (829 SE2d 763) (2019). With respect to waiver, Georgia law provides that the mental health "privilege is held only by the patient, and therefore, only the patient may waive it." *Neuman v. State*, 297 Ga. 501, 510 (3) (773 SE2d 716) (2015) (citation omitted). Moreover, the "in the absence of an express waiver by the patient, one seeking the disclosure of privileged mental-health records must establish a waiver by the patient's decisive unequivocal conduct reasonably inferring the intent to waive." *Cooksey*, 295 Ga. at 433 (2) (citation, punctuation, and footnote omitted).

DiPietro contends that because A. S.'s mental health records were no longer privileged, as A. S.'s mother had voluntarily given them to his counsel, the defense should have been permitted to enter them into evidence at trial. Specifically, DiPietro intended to have Dr. Matthew Norman, a forensic psychiatrist, testify about the

[7] There is no dispute that A. S. did not waive the privilege here.

19

relevant mental health state of A. S., partly based on his review of her mental health records that had been provided to the defense by DiPietro's mother. Prior to the start of trial, the trial court held a hearing pursuant to *Bobo v. State*, 256 Ga. 357 (349 SE2d 690) (1986).[8] Dr. Norman proffered that a person with A. S.'s mental health symptoms, which were consistent with a possible diagnosis of adolescent bipolar disorder, would be more prone than the average person to making a false outcry of a sexual nature, as well as lying and manipulating the truth.

Pretermitting the issue of whether A. S. was authorized to reassert the privilege after reaching the age of majority, the trial court ultimately ruled that Dr. Norman could not testify as to the impact of the victim's mental health condition — as documented in the contested mental health records — on the credibility of her outcry against DiPietro because the expert's conclusions lacked sufficient probative value,

---

[8] In *Bobo*, our Supreme Court held, in a plurality opinion, that a witness's statutory psychiatrist-patient privilege must yield to the defendant's constitutional right of confrontation if the defendant makes a "showing of necessity, that is, that the evidence in question is critical to his defense and that substantially similar evidence is otherwise unavailable to him." 256 Ga. at 360 (4). Our Supreme Court explained that the psychiatrist-patient privilege "prohibits the defendant from engaging in a 'fishing expedition' regarding a witness's consultations with a psychiatrist. Therefore, a defendant may not explore such evidence unless he makes allegations sufficient to establish a prima facie need for its discovery[.]" Id.

and thus was inadmissible under OCGA § 24-4-403. Specifically, the court was troubled by the validity of Dr. Norman's opinion, which amounted to "guesswork and speculation[,]" "because this isn't his field," and "because of the rather raggedy patchwork of sources that he had to deal with." Moreover, the court highlighted that Dr. Norman's testimony was not necessary to undermine A. S.'s credibility, and the defense could reach this issue "in a full-throated way, without invoking the cloak of this medical expert[,]" as "there were all sorts of reasons why an angry, emotional teenager would do something like this given the fractured family life she had experienced."[9] DiPietro has not challenged this portion of the trial court's ruling on appeal. Notably, the trial court specifically explained that its ruling to bar Dr. Norman's testimony with respect to the victim's mental health records was in no way predicated on how the information was disclosed, thus rendering the privilege issue moot. We therefore need not reach DiPietro's privilege argument on appeal.

For the reasons set forth above, we affirm the trial court's order denying DiPietro's motion for new trial.

*Judgment affirmed. Barnes, P. J., and Pipkin, J., concur.*

---

[9] Indeed, as previously noted, the defense introduced testimony from several witnesses, including A. S.'s brother, to show that A. S. is not honest and is prone to manipulation.