**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**September 23, 2014**

# In the Court of Appeals of Georgia

A14A1357. HARRIS v. THE STATE.

BARNES, Presiding Judge.

Following a jury trial in 2006, Marvin Harris was convicted of one count each of rape and kidnapping. He filed a motion for new trial, which was denied by the trial court.[1] On appeal, Harris argues that the trial court applied the wrong standard and refused to exercise its discretion when concluding that the defense opened the door to character evidence and, consequently, erred by admitting evidence of Harris's prior

---

[1] The reason for the exceptional delay between Harris's trial and the denial of his motion for new trial is unexplained by the record. Although he was appointed new counsel and filed a timely motion for new trial following his conviction, Harris subsequently filed a pro se motion for new trial in December 2008. The trial court issued an order denying Harris's pro se motion in January 2009. In August 2010, Harris's counsel filed a motion to vacate Harris's pro se motion, and in April 2011, the trial court issued an order vacating the prior order denying his motion for new trial. Harris's counsel thereafter filed an amended motion for new trial, which was denied in January 2013, and that denial order forms the basis of this appeal.

convictions. He further argues that the trial court erred by admitting certain testimony from the State's expert that he alleges was nonresponsive and improperly bolstered the victim's testimony. We find no error and affirm.

On appeal from a criminal conviction, we construe the evidence in the light most favorable to the verdict, and the defendant no longer enjoys the presumption of innocence. See *Knight v. State*, 251 Ga. App. 145 (553 SE2d 670) (2001). We neither weigh the evidence nor assess witness credibility, both of which lie exclusively within the province of the jury. See *Bell v. State*, 311 Ga. App. 289 (715 SE2d 684) (2011).

So viewed, the evidence adduced at trial showed that in April 1995, Harris and his cousin had driven from Birmingham to Atlanta in order to attend "Freaknik," an annual African-American college weekend event. The 19-year-old victim had also attended the event and, after exiting the MARTA train to return home, discovered that the last bus had departed the station. She was preparing to walk home when she encountered Harris, who was the passenger in his cousin's vehicle.

Harris exited the vehicle and approached the victim in a flirtatious manner before grabbing her arm and pulling her into the car. Once inside, Harris repeatedly told her that there was a gun in the glove compartment. Harris then had sexual

intercourse with the victim in the front seat of the vehicle while his cousin drove. The men then switched positions and Harris's cousin also had sexual intercourse with her. Throughout the ordeal, the victim was crying and pleading to go home.

When the assaults were over and the vehicle was stopped at a traffic light, the victim ran out of the car to the vehicle immediately behind it and begged the driver, "Let me in. Let me in. [I've] just been raped." The driver, who happened to be a former schoolmate of the victim, observed that she was crying hysterically, her clothes were disheveled, and she appeared to be "running for her life." Expressing shame and fear that the perpetrators would discover where she lived, the victim asked that she not be taken home. The driver therefore drove the victim around for several hours before taking her to his own house and allowing her to rest.

The following morning, the driver took the victim home and she relayed to her mother that she had been raped by two men. Her mother immediately called the police and the victim was taken to the hospital, where a rape kit was performed and cervical swabs were taken in order to preserve any biological evidence. A DNA profile was subsequently created from those cervical swabs and was entered into the Georgia Bureau of Investigation's ("GBI") DNA database.

In August 2005, the GBI received notification of a possible match between the DNA sample taken from the victim and that of Harris. The GBI alerted the Atlanta Police Department and during the ensuing investigation, the victim gave a second statement consistent with the one she gave shortly after the crime. Harris was also interviewed and admitted that he and his cousin picked up the victim at the MARTA station on the night in question and both had sexual intercourse with her in the front seat of the vehicle while the other drove, although he denied any mention of a weapon and claimed the sex was consensual.

Harris was subsequently arrested and charged with rape[2] and kidnapping.[3] During the trial, the jury heard testimony from the victim, the former schoolmate into whose car she ran, the investigator who interviewed her at the time of the crime, and the investigator who interviewed both her and Harris in 2005 after the DNA match was discovered. Additionally, the victim's mother testified that after the incident, the victim became isolated and withdrawn, cried continuously, and cut off her hair in an

---

[2] See OCGA § 16-6-1 (a) (1) ("A person commits the offense of rape when he has carnal knowledge of . . . [a] female forcibly and against her will.").

[3] See OCGA § 16-5-40 (a) ("A person commits the offense of kidnapping when such person abducts or steals away another person without lawful authority or warrant and holds such other person against his or her will.").

effort to appear unattractive to men. And finally, the State presented an expert in the psychology of rape who had not interviewed the victim, but who testified in general about certain patterns of behavior frequently exhibited by rape victims and stated that it is not uncommon for such victims to be reticent about reporting the crime to family or to law enforcement.

Harris's cousin was the only defense witness. He admitted he was the other man in the car with Harris. Like Harris, the cousin claimed that the men picked up the victim from the MARTA station and alternated driving and having consensual sexual intercourse with her. The cousin also admitted that he had been diagnosed with schizophrenia subsequent to the incident, and he rambled in his responses to questions during the direct examination. In the course of a rather long-winded and nonresponsive answer to a question from Harris's counsel asking whether Harris and the victim had been talking, singing, or doing anything, the cousin responded,

> I was quiet. Everybody was nice to each other, you know. Everybody was just quiet. To be honest with you, everybody was just quiet, and were [were] having a nice time, you know, enjoying the Freaknik. We [were], you know — *we were really probably the nicest people out there*, you know. We [were] kind of quiet. Everything else was kind of loud. We [were] kind of quiet, you know, and, you know, and — that's really all I kind of remember about that, you know what I am saying.

5

(Emphasis supplied.) Harris did not object to the statement, move to strike it as nonresponsive, and or ask the judge to direct the witness to limit his answers to the questions asked.

During cross-examination of the cousin, the State moved to admit Harris's prior convictions to rebut evidence of Harris's good character and/or to impeach the cousin's statement that Harris was one of "the nicest people" at Freaknik. The defense strenuously objected to their admission. The trial court overruled the objection and admitted Harris's criminal history on the ground that the defense opened the door to character evidence through the cousin's testimony. The State then introduced evidence of Harris's three prior robbery convictions and prior conviction for possession of marijuana by asking Harris's cousin whether his opinion of Harris would change had he been aware of them. The cousin responded that it would not.

The jury convicted Harris on both counts and the trial court ultimately denied his motion for new trial. This appeal follows.

1. Harris argues that the trial court "refused to apply the proper standard of whether the defense intended to introduce evidence of Appellant's character and abused its discretion by admitting Appellant's prior convictions." Specifically, Harris contends that he did not intentionally place his character at issue through the cousin's

6

"inadvertent statement" and that the trial court mistakenly believed it could not determine whether Harris intended to put his character into evidence and thus "refused to exercise its discretion." He further argues that the statement itself is not about Harris's character but only compared how quiet the men were in contrast to others that night. We disagree that the trial court failed to exercise its discretion or abused it.

As a general rule, bad character evidence of a criminal defendant is irrelevant and inadmissible. See OCGA § 24-2-2 (1996) ("The general character of the parties and especially their conduct in other transactions are irrelevant matter unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct.").[4] But "the defendant may open the door to bad character evidence if he intentionally elects to put his character at issue, and a witness may be impeached by disproving the facts to which [he] testifies." (Footnotes omitted.) *Arnold v. State*, 305 Ga. App. 45, 51(4) (699 SE2d 77) (2010); *Redman v. State*, 281 Ga. App. 605, 606 (2) (636 SE2d 680) (2006) (holding that the defense witness's testimony of defendant's good character "opened the door for the State to

---

[4] OCGA § 24-2-2 was repealed with the adoption of the new evidence code, effective January 1, 2013. See Ga. L. 2011, Act 52, § 2. The admission of character evidence is now governed by OCGA § 24-4-404.

introduce all evidence bearing on his character, including convictions of crimes, guilty and nolo contendere pleas, juvenile offenses, and incidents which illustrate the defendant's character") (punctuation omitted); *Porter v. State*, 243 Ga. App. 498, 502 (3) (532 SE2d 407) (2000) ("Once a defendant opens the door for character evidence, specific events may be used in testing the extent and foundation of the witness's knowledge and the correctness of his testimony on direct examination.") (punctuation omitted).

An inadvertent or nonresponsive answer by a witness that invokes the defendant's good character, however, does not automatically "put his character [at] issue" so as to open the door to character evidence. (Punctuation omitted.) *Jones v. State*, 257 Ga. 753, 758 (1) (363 SE2d 529) (1988). Significantly, "[w]hether a statement making reference to the defendant's good character is merely inadvertent or manifests a conscious election is a question of fact, determined primarily upon the trial court's assessment of the intent of the accused and his counsel." (Punctuation omitted.) *Hill v. State*, 243 Ga. App. 124, 127 (3) (532 SE2d 491) (2000). We afford great deference to the trial court's rulings in this regard. See id.; *Arnold*, 305 Ga. App. at 51 (4) ("Whether the defendant has intentionally opened the character door is a matter for the trial court to determine, and the trial court's evidentiary decisions will

not be disturbed on appeal absent an abuse of discretion.") (punctuation and footnotes omitted).

Here, although counsel's question to Harris's cousin may not have been specifically aimed at eliciting character evidence, it was, as admitted by counsel, part of his trial strategy to allow the witness to give lengthy and nonresponsive answers to his questioning. Indeed, throughout the cousin's testimony, he routinely gave long, nonresponsive answers—sometimes a single answer spanning over multiple pages—and at no time did counsel object or request that the witness confine his answers to the question asked. It is for this reason that the trial court expressly held that

> if [the defense] strategy is to let [the witness] talk and talk, and he says something that you don't like, even though its being nonresponsive and you can object to it being nonresponsive, it is what it is. There is nothing I can do. You have to take the good with the bad.

We disagree with Harris that the trial court refused to assess counsel's intent or abdicated its responsibility to exercise discretion in holding that the defense opened the door to character evidence. Harris called his schizophrenic cousin as a witness and allowed him to place himself at the scene and identify himself as one of

9

the two men accused of rape.[5] Harris did not discourage the cousin's long, rambling responses throughout his testimony. The trial court exercised its discretion and concluded that counsel's conscious decision not to object or redirect the nonresponsive witness once he made a reference to Harris's character created an inference that counsel intended to inject character evidence into the trial and thus triggered the State's right to explore and impeach that testimony.

Under these circumstances, we cannot say that the trial court erred in finding that the defense opened the door to the admission of character evidence. See *Franklin v. State*, 251 Ga. 77, 80 (2) (303 SE2d 22) (1983) (holding that in the absence of an objection or motion to strike, a witness's statement that defendant was "all right" opened the door to character evidence); *Merritt v. State*, 288 Ga. App. 89, 100 (3) (653 SE2d 368) (2007) (affirming trial court's holding that defendant opened the door to character evidence by testifying as to his feeling of remorse). Compare *Lindsey v. State*, 282 Ga. 447, 449-50 (2) (651 SE2d 66) (2007) (defendant's statement that he was "not violent" when testifying that he had never been convicted of a felony or any crime of violence was an "inadvertent statement of his good character" and did not

---

[5]The cousin was not identified as the second man involved in the rape until he took the stand and testified about the crime.

10

open the door evidence of his two dozen misdemeanor arrests); *Stinson v. State*, 221 Ga. App. 758, 758-59 (1) (472 SE2d 538) (1996) (defendant's single, nonresponsive answer that he did not "convert . . . to a criminal life" did not open the door to evidence of his prior arrests).

Harris further asserts that the cousin's response was not character evidence at all, but simply a comment on the amount of noise they were making relative to the other people at the event. Reviewing the answer in the context of the entire trial, we conclude that the trial court did not abuse its discretion in finding that the comment constituted character evidence.

2. Harris next argues that the trial court erred in admitting testimony from the State's expert witness that he asserts bolstered the victim's testimony. Again, we disagree.

During voir dire questioning from Harris's counsel, the witness confirmed that she had not reviewed the record in this case, had not interviewed the victim, and had "no idea" whether the sexual intercourse between Harris and the victim was consensual; she was being offered to answer questions with respect to generalized patterns of behaviors that rape victims may exhibit. Counsel nonetheless asked the witness several questions related to individuals who make false rape accusations, and

11

the witness explained that she was not charged with investigating the veracity of a person's report—a task left to the police—and that she had never knowingly received a fabricated allegation of rape. Pushing the issue, counsel asked, "So[,] someone comes in, tells you something, you're on board; right?" The witness responded, "Correct. Nationally, statistics show that less [than] 1 percent of people falsely report rape."

Counsel objected to the statement on the ground that it was nonresponsive, irrelevant, and the witness had not yet been tendered as an expert. Before the trial court ruled on that objection, however, counsel immediately launched into a lengthy objection to the qualification of the witness as an expert on the basis that the prejudicial effect of her testimony outweighed its probative value and, further, that her testimony was irrelevant and immaterial in that it would not assist the jury in determining Harris's guilt or innocence. The trial court overruled the objection and qualified the witness as an expert in the psychology of rape.

Harris argues that the trial court erred in admitting the expert witness's statement of statistical evidence and, further, that her testimony improperly bolstered the victim's credibility and invaded the province of the jury. But Harris's counsel failed to invoke a ruling from the trial court as to his specific objection to the

12

witness's statement, elicited by him during voir dire, regarding fabricated reports of rape. And to the extent his objection to the testimony could be read to have included improper bolstering or invading the province of the jury, we have held that "an expert witness may testify as to the existence of certain typical patterns of behavior exhibited by victims of rape, as long as the jury was permitted to draw for itself the final conclusion as to whether the victim in the case at hand was raped, as was the case here." (Punctuation omitted.) *Harris v. State*, 283 Ga. App. 374, 381 (4) (a) (641 SE2d 619) (2007); see also *Edmonson v. State*, 212 Ga. App. 449, 450-51 (1) (442 SE2d 300) (1994), overruled in part on other grounds, *Curtis v. State*, 275 Ga. 576, 578 (1) (571 SE2d 376) (2002). The expert here admitted that she had not met or interviewed the victim and could offer no opinion as to whether the sexual intercourse involved was voluntary. It follows that the trial court's admission of this testimony was not erroneous and does not afford Harris a new trial.

*Judgment affirmed. Boggs and Branch, JJ., concur.*