**FIRST DIVISION
BARNES, P. J.,
BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**March 6, 2023**

# In the Court of Appeals of Georgia

A22A1722. WHIPKEY v. THE STATE.

HODGES, Judge.

In 2014, a jury found Robert Ray "Bobby" Whipkey guilty of multiple crimes perpetrated against two 14-year-old girls, E. G. and A. D.: rape (OCGA § 16-6-1) (E. G.); two counts of enticing a child for indecent purposes (OCGA § 16-6-5) ( E. G., A. D.); two counts of aggravated child molestation (OCGA § 16-6-4 (c)) (E. G., A. D.); and one count each of rape (OCGA § 16-6-1) (E. G.) and aggravated sexual battery (OCGA § 16-6-22.2) (A. D.).[1] Whipkey appeals from the denial of his motion

---

[1] Whipkey also was found guilty of one count of statutory rape (OCGA § 16-6-3 (a)) (E. G.) and two counts of child molestation (OCGA § 16-6-4 (a)) (E. G., A. D.), but those counts merged into his convictions for rape and aggravated child molestation for sentencing purposes.

and amended motions for new trial.[2] He argues that the trial court erred in (1) charging the jury; (2) admitting evidence of bad character under OCGA § 24-2-414; (3) admitting character evidence of untruthfulness; (4) denying his Sixth Amendment right to effective assistance of counsel; and (5) denying his motion for a continuance to seek new counsel. Whipkey does not challenge the sufficiency of the evidence underlying his convictions. For the reasons that follow, we affirm.

We review the evidence in the light most favorable to the prosecution, under the standard set forth in *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). We do not judge witness credibility or weigh the evidence, nor do we resolve evidentiary conflicts, as those matters are for the jury. *Whitehead v. State*, 304 Ga. App. 213, 214 (1) (695 SE2d 729) (2010).

So viewed, the abundant record evidence shows that Whipkey met both victims when they were 14 years old, after E. G. befriended and began dating Whipkey's 16-year-old son. About a month after they began dating, in August 2013, the son noticed

---

[2] This is the second appearance of this case before this Court. See *Whipkey v. State*, 353 Ga. App. 592, 593 (838 SE2d 907) (2020) (finding trial court "erred by issuing a scheduling order which was in direct conflict with Whipkey's statutory right to amend his motion for new trial at any time prior to the trial court's ruling on the motion[,]" and vacating and remanding for a hearing). The trial court held a hearing and denied Whipkey's motion and amended motions. This second appeal ensued.

2

that E. G. and his father were becoming close, with E. G. treating him as a father figure.

*E. G. and A. D.*: E. G. testified that she at first "looked at [Whipkey] kind of like a dad." However, Whipkey "shocked [her] a little bit" when he asked for a pair of her underwear. Whipkey "didn't want them clean. He never did. . . . It was just the scent." A. D. recalled Whipkey taking and smelling E. G.'s underwear. He also asked A. D. for her underwear, promising to give them back washed with a new pair "for free." Once, he gave E. G. more than $20 in exchange for her panties.

Whipkey bought whippets[3] for both girls. E. G. testified that she first used whippets with Whipkey: "We started using them more and more and more and more and more and more and more . . . they're fun, so then they just got bigger and bigger from the quantities." A. D. testified that the trio did methamphetamine together, and that Whipkey brought them a vibrator, whippets, and panties. Whipkey gave E. G. gifts: a painting, a necklace, a lighter, a phone, cigarettes, methamphetamine, and a vibrator.

---

[3] Whippets are inhalant drugs comprised of nitrous oxide, also known as laughing gas, contained in small canisters. www.webmd.com/mental-health/addiction/what-are-whippets (February 13, 2023).

3

Whipkey began telling E. G. "sexual jokes" and on 25 or 30 occasions, showed her "sexual pictures" which she described as "pornography." He showed her photographs of his adult girlfriend in partial states of undress. A. D. testified that he showed her a "sex game" and a photo album of young girls "in their underwear[,]" and talked about her and E. G.'s bodies in ways "that aren't normal for an adult to be saying or acting that way." Whipkey sent E. G. social media messages, writing, "Tell me you're not on your period. I want to have you for breakfast, dessert. . . . I have your old panties for you" and "Hope you[r] dad doesn't come home early. I would be pounding you so hard. Sorry, just kidding. . . You are so hot, sexy, damn."

*Bombay Nights*: E. G. testified that she, A. D., Whipkey's son, and other teens on 15 or 16 occasions attended "Bombay Night" parties at a friend's house. The teens drank a lot of alcohol – particularly Bombay Sapphire gin – and played games. Whipkey was usually the only adult present. At a Bombay Night in October 2013, Whipkey showed up, and everyone was drinking heavily. Both girls testified that they left the party with Whipkey. He drove them to buy cigarettes.

Instead of going back to the party, Whipkey took E. G. and A. D. to the basement of his mother's house and gave them whippets. E. G. was very drunk. The girls sat on opposite sides of a yellow sofa, with Whipkey crouched between them.

4

E. D. did not recall how many whippets she had done because "it was pretty much, just, like constant . . . ." E. G. testified that she "looked over and [A. D.] didn't have her pants on and Bobby was doing whatever he was doing to her. . . . And then I looked back and my pants were off and he was, like, doing stuff to both of us." Whipkey had his "fingers in" both her and A. D. Then A. D. got sick and began vomiting. Whipkey gave E. G. another whippet and she was "out of it." Whipkey then put his penis into E. G.'s vagina. She testified, "I looked at the clock and it was 3:33 [a.m.], and then I just closed my eyes and, like, waited for it to be over[,]" adding that this was "[t]he last thing I ever wanted to happen" and "it scared me."

A. D. also testified about the party. She drank "around 12" shots of Bombay Sapphire that evening. A. D. remembered "falling down the driveway" of Whipkey's mother's house and being "confused" because she believed they were going somewhere else. She was "not sober at all" and Whipkey gave her whippets although she did not ask for them. She described whippets as "fun[,]" but testified that the drug "makes you pass out. . . . I remember passing out but I don't know how long." At Whipkey's mother's house, A. D. recalled sitting on a sofa with E. G. while Whipkey put his fingers inside her vagina and also performed oral sex on her. Whipkey did not stop until A. D. "had to vomit, and [she] was grossed out and confused." She recalled

5

thinking, "this is not right" and feeling "[u]ncomfortable, violated." She did not ask Whipkey to perform sex acts on her. After she vomited, she saw him perform oral sex on and then have intercourse with E. G. When A. D. talked with Whipkey after that night, she testified that he told her, "everything that happened that night was greater than any fantasy or dream that he's ever had."

*Whipkey's son*: Whipkey's son, who went to the October Bombay Night, testified that E. G. eventually told him what his father had done. He called his father and said "I know what happened. I'm coming . . . to talk to you about it." But when the son and E. G. got to the father's house 20 minutes later, Whipkey was "laying on the ground on his stomach, . . . sobbing." Whipkey told him he had fallen downstairs and broken his ribs. The son called an ambulance, and Whipkey was taken to the hospital. The son went to Whipkey's hospital room, where a nurse was giving him medicine and checking his vitals. Thinking that "if something bad happens you always need to have proof[,]" the son confronted Whipkey while recording the conversation on his phone. At first Whipkey "denied everything." The son testified that he asked, "Dad, you know, [E. G.] is saying . . . you raped her[,]" and Whipkey responded, "I raped her." The son then asked, "Did you have sex with her[?]" and Whipkey said, "[N]o. . . . I went down on her." Whipkey also said he "went down"

6

on A. D. The son e-mailed the recording to E. G.'s father, and eventually spoke to police about it. The full recording was admitted into evidence without objection and played for the jury.

*Bobby Whipkey*: Whipkey testified in his own defense. He was 52 years old at the time of trial. He admitted doing whippets with the teens, "to show the kids that I was kind of cool[,]" but denied providing A. D. and E. G. with whippets or other drugs. Asked if he used sexually explicit language with A. D. and E. G., he acknowledged telling "jokes and stuff" but asserted that the girls and his son also told sexually explicit jokes. He acknowledged showing photos of women to E. G., but denied that the women were unclothed, saying they might have been in swimsuits. He did not recall showing E. G. a vibrator, though he recalled that he twice "found" her panties on the floor of his bedroom. He admitted asking E. G., his son's girlfriend, for her panties while his son was present, but testified that he was "joking[,]" and that he was also "joking" when he sent E. G. the message saying he wanted to "have her for breakfast[,] dessert."

Whipkey testified that he attended the Bombay Night where many of the crimes at issue took place: "Like you heard, all these kids are doing every drug possible. That's why I was there, to make sure my son didn't do it." He testified that his son

was "like my best friend," whom he loved "more than anything in the whole world except for God."

Whipkey testified that at the party, E. G. told him she had done "15 shots," and A. D. had done 12 or 15 shots. Whipkey denied giving them alcohol, but said his son had done so. He knew both girls were 14 years old. Whipkey testified that his son was vomiting from all the alcohol he had drunk, but that E. G. wanted cigarettes, so Whipkey took her and A. D. buy them. He did not let them smoke in the car because it belonged to his mother. He testified that E. G. and A. D. were making out in the back seat of the car, with their pants down and shirts almost off, having oral sex and doing whippets while he "looked back over a couple times." Whipkey noted that he had seen the girls engage in this behavior before, "Five different times I saw." He testified that they were out for 45 minutes to an hour before returning to the party. As for E. G. and A. D.'s testimony about his sexual actions with them, Whipkey testified, "I didn't do that. I did not touch them girls."

*Outcry*: Some time after the Bombay Night party, E. G. broke up with Whipkey's son because "I just didn't want to be around it anymore" and she was afraid that the son would "figure out" what happened between her and his father. Whipkey sent her messages via social media, writing, "You don't want me no more,

do you? You don't want [my son] no more." And, "I swear I don't give a shirt [sic] if you date [my son]."

E. G. and A. D. initially agreed not to tell anyone what happened. But in mid-December 2013, two months after the party, A. D. was admitted to a rehabilitation facility and disclosed what Whipkey had done. E. G. at first denied what had happened, then went to talk to Whipkey about the outcry. E. G. testified that he said, "My life is literally in your hands."

1. Whipkey argues that the trial court erred in its jury charge on aggravated sexual battery because the wording of the charge relieved the State of its burden to show that A. D. did not consent. We find no plain error.

OCGA § 16-6-22.2 (b) provides that: "A person commits the offense of aggravated sexual battery when he or she intentionally penetrates with a foreign object the sexual organ or anus of another person *without the consent of that person*." (Emphasis supplied.) The trial court first properly charged the jury using this statutory language. It then charged the jury on enticing a child for indecent purposes; that penetration, however slight, sufficed to satisfy the penetration requirement of rape and aggravated sexual battery; that the age of consent is 16; and that it is a crime to have physical sexual contact with a child aged 15 or younger. The trial court then

9

charged that: "The State is not required to show that the alleged victim did not consent to the sexual act when the alleged victim is a child 15 years of age or younger."

Whipkey did not object to this jury instruction. We thus review this contention only for plain error. See OCGA § 17-8-58 (b).

> To show plain error, [Whipkey] must [1] point to an error that was not affirmatively waived, [2] the error must have been clear and not open to reasonable dispute, [3] the error must have affected substantial rights, and [4] the error must have seriously affected the fairness, integrity or public reputation of the judicial proceedings.

(Citation omitted.) *State v. Williams*, 308 Ga. 228, 231 (2) (838 SE2d 764) (2020). The State points us to nothing indicating that Whipkey affirmatively waived error in this context. Further, our Supreme Court has determined that because aggravated sexual battery, like sexual battery, "does not require that the prohibited conduct be sexual in nature[,] . . . the State is not exempt from proving lack of consent at trial merely because the victim is under the age of sixteen when establishing a violation of the aggravated sexual battery statute." Id. at 232 (2).[4] Thus, "the trial court's

---

[4] *Williams* recognized that the "intentional penetration with a foreign object of an underage individual's sexual organ or anus could include non-sexual conduct" such as what might occur in a legitimate medical examination. 302 Ga. at 232 (2).

10

instruction on underage consent was clearly erroneous when coupled with the charge on aggravated sexual battery." Id. at 231 (2).

Whipkey has met the first two prongs of the plain error test but has failed to meet the latter two. Relieving the State of its burden of proving an element of a crime may, in some instances, be harmful error affecting the outcome of a proceeding. See *Williams*, 308 Ga. at 232 (2). But in the plain error context, Whipkey "has the burden of making an affirmative showing that the error probably did affect the outcome below." (Citation and punctuation omitted.) *Bozzie v. State*, 302 Ga. 704, 708 (2) (a) (808 SE2d 671) (2017). Whipkey has made no such affirmative showing.

Whipkey argues on appeal that A. D. was a "drug user" who had previously given him her used underwear and that she "possibly" had sex with him in exchange for money.[5] This, he contends, means a rational juror could have concluded that the State failed to prove consent. We disagree.

---

[5] Whipkey points to a witness who testified about the sexual encounters. She testified that she heard two different versions of events "based on who was there," but that she "was not there to witness it." She was "[n]ever around [A. D.] and [Whipkey] at the same time[,]" and that "it wouldn't make sense to say whether I believed [A. D.] or not considering I never heard the story from [A. D.]." The witness's testimony never addressed facts related the particular crime at issue here, aggravated sexual battery.

11

Pertinently, "[t]here was no allegation or contention that [Whipkey's] conduct was benign or non-sexual in nature, and the evidence of his actions was substantial." *Williams*, 308 Ga. at 232-233 (2). Further, given the amount of alcohol and drugs A. D. consumed, Whipkey's own testimony that he knew she had drunk a dozen or more shots of gin, A. D.'s testimony that she felt uncomfortable, violated, and that Whipkey's actions were "not right," and her testimony about being confused and passing out, "[i]t is hard to fathom any context in which a child [so impaired by alcohol and drugs] would have the capacity to consent to such conduct by an adult[.]" Id. (finding that, even where trial court's aggravated sexual battery charge erroneously relieved State of burden to show lack of consent, victim was four years old and "no rational juror could have concluded, based on the record presented at trial, that the State had failed to prove the element of [lack of] consent."); accord *Nembhard v. State*, 360 Ga. App. 568, 569-570 (1) (859 SE2d 118) (2021) (finding no rational juror could find State failed to prove lack of consent where 8-year-old testified that she felt uncomfortable being touched by adult male tutor and "'didn't really know what he was doing'"); see also *Croft v. State*, 358 Ga. App. 380, 382 (855 SE2d 396) (2021) (finding no plain error in jury charge on aggravated sexual battery that relieved State of proving lack of consent where 15-year-old victim slapped

12

defendant's hands and told him to stop, because, given this evidence, it was unlikely that charge affected trial outcome). Here, it is likewise "unlikely, given the evidence presented in this case, that the instruction at issue affected [Whipkey's] substantial rights . . . [or that it] affected the jury's decision to return a verdict of guilty for the charge of aggravated sexual battery." *Williams*, 308 Ga. 232-233 (2). We find no plain error.

2. Whipkey next argues that the trial court erred by admitting "bad character evidence" under OCGA § 24-4-414, from eight witnesses.[6]

As trial counsel did not object below, we review this enumeration for plain error. *Williams*, 308 Ga. at 231 (2) (outlining four prongs of plain error analysis); *Wilson v. State*, 312 Ga. 174, 178 (1) (c) (860 SE2d 485) (2021) (applying plain error analysis where no objection was raised under OCGA § 24-4-414); *Davis v. State*, 302 Ga. 576, 581 (2) (805 SE2d 859) (2017) (same, for OCGA §§ 24-4-403, 24-4-404 (b)).

The State filed a notice of intent to present other acts evidence pursuant to OCGA §§ 24-4-404 (b) and 24-4-414.

---

[6] Whipkey's enumeration of error mentions nine witnesses, but he presents argument only as to eight of them.

13

OCGA § 24-4-404 (b) provides, in pertinent part, that

Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

OCGA § 24-4-414 provides, in pertinent part, that:

(a) In a criminal proceeding in which the accused is accused of an offense of child molestation, evidence of the accused's commission of another offense of child molestation shall be admissible and may be considered for its bearing on any matter to which it is relevant. . . . (d) As used in this Code section, *the term "offense of child molestation" means any conduct or attempt* or conspiracy to engage in:

(1) Conduct that would be a violation of Code Section 16-6-4 [child molestation], 16-6-5 [enticing a child for indecent purposes], 16-12-100 [sexual exploitation of children], 16-12-100.2 [computer or electronic pornography], or 16-12-100.3 [obscene telephone contact][.]

(Emphasis supplied.)

As an initial matter, Whipkey argues that the trial court granted the State's motion only as to Rule 414 and not as to Rule 404 (b). We disagree. The trial court ruled from the bench, saying "*I'll grant the State's motion* to introduce that other

14

evidence, with one exception or with one caution." (Emphasis supplied.) That caution was "there are nonspecific references to conversations that I could make no possible ruling as to whether or not it constituted an act of child molestation or some other act that's defined by the code that would be admissible under *the initial statute of 2[4]-4-414*." (Emphasis supplied.) Thus, the trial court granted the State's motion as to both Rule 414 and Rule 404 (b), with an exception only as to some evidence that would be admissible under the former statute.[7] Further, the trial court gave a Rule 404-based limiting instruction, telling the jury that the State would be offering other acts evidence, and that the jury could consider it only for the purpose of showing Whipkey's motive, opportunity, and predisposition, and not as evidence of his character, and later gave a similar instruction just before the other acts witnesses testified.

On appeal, Whipkey argues that the State "failed to establish the commission of the required designated offenses for the admissibility of other acts under OCGA

---

[7] It is unclear from the motion colloquy exactly what evidence the trial court was referencing. Whipkey does not address this on appeal.

15

§ 24-4-414." The offenses, as noticed by the State, were enticing a child for indecent purposes and contributing to the delinquency of a minor.[8]

OCGA § 16-6-4 (a) provides that "[a] person commits the offense of child molestation when such person: (1) Does an immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person[.]"

OCGA § 16-6-5 (a) provides that "[a] person commits the offense of enticing a child for indecent purposes when he or she solicits, entices, or takes any child under the age of 16 years to any place whatsoever for the purpose of child molestation or indecent acts."

OCGA § 16-12-1 (b) provides that "[a] person commits the offense of contributing to the delinquency . . . of a minor . . . when such person: (1) Knowingly and willfully encourages, causes, abets, connives, or aids a minor in committing a delinquent act[.]"

_____

[8] Contributing to the delinquency of a minor (OCGA § 16-12-1) is not one of the statutes expressly encompassed by OCGA § 24-4-414 (a) (1), though it may be encompassed under OCGA § 24-4-404 (b). Enticing a child for indecent purposes, OCGA § 16-6-5 (a), does come within the purview of Rule 414.

16

(a) *Other acts occurring when witnesses were over the age of 16*. Whipkey argues that testimony from two witnesses was inadmissible under OCGA § 24-4-414 because the acts occurred when the witnesses were over the age of 16.

(i) *R.*: R. testified that when she was about 17, Whipkey tried to touch her between her legs with a vibrator, but she pushed him away. Whipkey also showed her videos of people having sex and talked to her about orgasms.

Whipkey contends that the trial court erred in admitting R.'s evidence under OCGA § 24-4-414's "child molestation" other acts provision, through OCGA § 16-6-5 (a), the enticing statute. He argues that because R. was 17, there was no evidence that the acts occurred to a child "under the age of 16 years" as provided by OCGA § 16-6-5 (a). This argument is misguided.

As outlined above, the trial court granted the State's motion not only as to Rule 414, but also as to Rule 404 (b), which, of course, encompasses evidence of other acts regardless of the victim's age as well as acts occurring under OCGA § 16-12-1 (a), contributing to the delinquency of a minor, the other crime listed in the State's notice. R. was a minor at the time the other acts occurred. See OCGA § 16-12-1 (a) (3) ("'Minor' means . . . any individual under the age of 18 years."). Whipkey does not argue that R.'s testimony was inadmissible under Rule 404, nor does he present any

17

argument regarding the sufficiency of her testimony to show an other act under OCGA § 16-12-1 (a), so we will not address the issue further. Whipkey has failed to show that the trial court plainly erred.

(ii) *K.*: K. is the mother of one of the other acts witnesses, B. When B. was in her early to mid-teens, K. and Whipkey dated. B. told her mother that Whipkey had asked for B.'s underwear. K. confronted Whipkey, who denied this. K. testified that B. was "not a liar," and that Whipkey "was infatuated with my underwear []as well, so I was not surprised."

Whipkey argues, for the first time on appeal, that the State failed to provide notice that K. would be an other acts witness; that because K. is an adult, her testimony regarding Whipkey's infatuation with her underwear is not admissible under OCGA § 24-4-414; and that she improperly bolstered B.'s testimony.

Whipkey points to nothing in his new trial motions or hearing raising these contentions as to K. The trial court's order neither mentions K. nor rules on her testimony. "The record before us reveals that the contention argued here was neither raised nor ruled on by the trial court; consequently, it was waived." *Brown v. State*, 288 Ga. App. 671, 674 (2) (655 SE2d 287) (2007).

18

(b) Whipkey argues that the trial court erred in admitting the testimony of six more other acts witnesses. He argues only that "the State failed to *establish the commission of the required offenses* for the admissibility of other acts under OCGA § 24-4-414."[9] (Emphasis supplied.) He presents no other arguments or citations to legal authority regarding the asserted inadmissibility of the evidence. Importantly, OCGA § 24-4-414 creates

> a rule of inclusion, with a strong presumption in favor of admissibility, and the State can seek to admit evidence under these provisions for any relevant purpose, including propensity. And a trial court's decision to admit other acts evidence will be overturned only when there is a clear abuse of discretion.

(Citations and punctuation omitted.) *King v. State*, 346 Ga. App. 362, 364 (1) (816 SE2d 390) (2018).

(i) *B.*: B. testified that when she was 15 years old, Whipkey offered to teach her to drive. After the lesson, he showed her an album with photographs of women's underwear on a clothesline, which he said belonged to her mother, K. He asked for

---

[9] While Whipkey asserts, in a single sentence, that the trial court did not mention OCGA § 24-4-403, he makes no argument on appeal that any of the evidence at issue was more prejudicial than probative and cites no other legal authority, so we do not address the issue further.

19

B.'s underwear, but she said no. He tried to bargain with her, saying that if she gave him one pair of her underwear, he would give her three new pairs.

Although Whipkey admitted that he took B. for driving lessons and showed her photos of her mother's underwear and swimsuits, he argues that there is no evidence he enticed B. for indecent purposes because he did not touch her, talk about sex, or show her sexually explicit images. The evidence was sufficient for Rule 414 purposes to show enticement in that Whipkey lured B. to take a driving lesson so he could attempt to groom her for child molestation by showing her photos of women's underwear and try to lure her into giving him her own underwear. "The offense of enticing does not require that the lewd act be accomplished or even attempted, merely that it was intended as motivation for the enticement." *Peavy v. State*, 159 Ga. App. 280, 281-282 (1) (a) (283 SE2d 346) (1981) (finding sufficient evidence of enticing where, inter alia, defendant feigned interest in buying pickled peppers from children selling them at the roadside, then asked the children if they knew anyone who "took dirty pictures"). Further, the asportation element of the offense is satisfied by Whipkey's luring B. into his car on the pretext of driving lessons, when he had ready a photo album with pictures of women's underwear that he showed her, and asked for her underwear. See *Reid v. State*, 361 Ga. App. 617, 619-620 (865 SE2d 245) (2021)

(holding that defendant's encouraging child to move from the couch to the floor so that she could perform oral sex on him was sufficient to show asportation); *Hamby v. State*, 358 Ga. App. 105, 110-111 (3) (853 SE2d 874) (2021) (finding evidence that defendant groomed child for purposes of molestation admissible under OCGA § 24-4-414).

(ii) *T.*: T. testified that when she was 14 or 15 years old, Whipkey drove her between her home and friends' houses at night and into the wee hours of the morning, that she went to Whipkey's house, where he bought her and other teens alcohol and "weed," and that they drank and rode motorcycles. In exchange for the alcohol and marijuana, Whipkey asked for T.'s "used and dirty" underwear so he could "sell them" and because they "tasted good." Whipkey also spied on T. and another girl while they changed clothes in a closet. Both girls told him to stop. He talked about sex and women's body parts with T., showed her an album with photos of naked women, and bought her underwear and lingerie and told her to wear it because it would be sexy.

Whipkey admitted that he bartered with T., giving her alcohol in exchange for her panties, but that this "was a long time ago[,]" and that he was prosecuted and went to jail for that action.

Whipkey has shown no plain error in admission of this evidence under either Rule 414 or Rule 404 (b). See *Dockery v. State*, 309 Ga. App. 584, 585-587 (711 SE2d 100) (2011) (finding evidence sufficient to show defendant was party to the crimes of enticing and child molestation where she gave victim thong panties, alcohol, and a folder containing "porn," asked if victim had ever had sex, kissed her on the lips, and was nearby when husband pulled down victim's pants and offered her $10 to put on the thong); *Clark v. State*, 323 Ga. App. 706, 708 (747 SE2d 705) (2013) (finding evidence sufficient to show enticing where defendant lured victim to motel, financed their trip across town, and asked about her weekend plans after seeing nude photos of her); *Reid*, 361 Ga. App. at 619-620 (asportation); *Little v. State*, 262 Ga. App. 377, 378 (a) (575 SE2d 677) (2003) (holding evidence sufficient for contributing to the delinquency of a minor when defendant provided victim with alcohol and marijuana).

(iii) *Z.*: Z. testified that when she was 14 or 15, Whipkey talked with her about sex and foreplay, and gave her sexual advice. He also gave her and her friends whippets.

Whipkey argues that the evidence does not meet the asportation element required by the enticing statute, and as a result, this evidence is not admissible under

22

Rule 414. As outlined above, the trial court also admitted the evidence under Rule 404 (b). The State noticed Whipkey regarding OCGA § 16-12-1, the contributing to a delinquency of a minor statute, which contains no asportation requirement. As Whipkey concedes in his brief, providing drugs such as whippets to a minor "may" – and in this case, does – constitute contributing to the delinquency of a minor. See *Little*, 262 Ga. App. at 378 (a).

(iv) *v.*: When V. was 13 and 14 years old, Whipkey drove her and her friends to his house "[r]eally late at night, like past midnight" without her parents' knowledge, ostensibly to hang out with Whipkey's son. Whipkey showed V. photos of "practically naked women," and "said he did sexual things with them." He told her sex jokes. Whipkey also asked her to get in a jacuzzi inside his house. She did, along with other acts witness G., see Div. (2) (b) (vi). V. wore only her bra and a "random girl's bathing suit bottom" that Whipkey gave her. Whipkey took photographs and sent them to the girls.

Whipkey argues that there was no evidence of asportation or indecency. This is incorrect. It is clear that Whipkey's driving V. to his house and asking her to get into his jacuzzi so he could photograph her in her bra is sufficient to show enticing and asportation. See *Reid*, 361 Ga. App. at 619-620. Whipkey also told the victim

23

sexually explicit jokes, showed her photos of "practically naked" women, and talked about having sex with them. We "have held that attempted enticement of a child for indecent purposes can be accomplished where the defendant engaged in sexually explicit communications" with someone under the age of 16 with whom he met. See generally *Hughes v. State*, 365 Ga. App. 448, 453 (2) (878 SE2d 791) (2022).

(v) *H.*: H. testified that when she was 14, Whipkey drove her to a lake house to spend time with his son and a friend. Whipkey made the teenagers daiquiris, and gave them access to other alcoholic drinks. H. testified that she drank nine alcoholic beverages. Whipkey stopped at an adult store, Tantra, while H. was in the car and bought whippets, which he gave her. H. had never done anything like this before. Then Whipkey began talking to her in a sexually explicit way and while they were in his car, and showed her a mechanized sex toy called a "bullet." He turned it on and explained how it worked.

H.'s testimony establishes the elements of enticing, OCGA § 16-6-5, for purposes of OCGA § 24-4-414. See *Hughes*, 365 Ga. App. at 453 (2); *Reid*, 361 Ga. App. at 619-620. As Whipkey concedes, giving children alcohol and whippets "may" – and in the case does – constitute contributing to the delinquency of a minor, OCGA

24

§ 16-12-1, and thus would have been admissible under OCGA § 24-4-404 (b). *Little*, 262 Ga. App. at 378 (a).

(vi) *G.*: G. testified that when she was 14, Whipkey picked her up in the middle of the night and took her to his house along with her friends, including V., see Division (2) (b) (iv). Her parents did not know. G. and Whipkey, along with other teens, hung out in his hot tub. G. wore only a sports bra and underwear. Whipkey photographed G. in her bra and underwear and showed her photos of women who were naked or wearing just underwear; he also said inappropriate sexual things. G. testified that she "paid" Whipkey for alcohol and rides by giving him her clean underwear, which he requested, and also a friend's dirty underwear. Whipkey admitted giving G. alcohol in exchange for her panties a few times.

G.'s testimony establishes the elements of enticing, OCGA § 16-6-5, for purposes of OCGA § 24-4-414. See *Hughes*, 365 Ga. App. at 453 (2); *Reid*, 361 Ga. App. at 619-620. Her testimony that Whipkey gave her alcohol constitutes contributing to the delinquency of a minor, OCGA § 16-12-1, and thus would have been admissible under OCGA § 24-4-404 (b). *Little*, 262 Ga. App. at 378 (a).

(c) Again, Whipkey argued as to the other acts witnesses discussed in Division (2) (b) only that "the State failed to establish the commission of the required offenses

25

for the admissibility of other acts under OCGA § 24-4-414." This is incorrect, as outlined above. Whipkey makes no argument regarding the similarity or dissimilarity of the other acts evidence, or the prejudicial versus the probative value of the evidence. Some of his own testimony was cumulative of that of witnesses T., B., and G. Whipkey has failed to show plain error.

3. Whipkey contends that the trial court erred in finding that he intentionally placed his good character in issue and, as a result, erred in permitting the State to examine his high school classmate, Susan Baxter, about a prior court order implicating his character for untruthfulness. Whipkey has waived this contention of error.

In general, evidence of a person's character is inadmissible. But if the defendant places his character in evidence, the door is opened for the prosecution to examine the witness about specific instances of the defendant's conduct reflecting bad character. See *Montgomery v. State*, 350 Ga. App. 244, 246-247 (1) (828 SE2d 620) (2019). "Whether the defendant has intentionally opened the character door is a matter for the trial court to determine, and the trial court's evidentiary decisions will not be disturbed on appeal absent an abuse of discretion." (Citation and punctuation omitted.) *Harris v. State*, 330 Ga. App. 267, 271 (1) (765 SE2d 369) (2014).

26

The State called Baxter to testify about, among other things, discussions she had with Whipkey about the charges against him and his interactions with A. D. and E. G. On cross examination, Whipkey's lawyer asked her to describe his personality. Baxter said, "Bobby's funny, he's warm, he's sensitive. . . . I just can't believe Bobby would do something like this." Counsel asked, "Has he always been a gentleman to you?" Baxter said, "Yes." Counsel also asked, "He told you the whole story . . . was he open and honest with you?" Baxter replied, "Yes[,]" and that she did not believe Whipkey was being evasive.

The State claimed that the defense opened the door to character evidence through its questions eliciting testimony that Whipkey was "generally a good guy and a gentleman." Whipkey's counsel argued that the State had no "good-faith belief" that the witness knew the answers to its proposed questions, but if she did, "I have no objections . . . ." The trial court found that the door had been opened. The State then asked Baxter if she knew that a different superior court had found that Whipkey committed a fraud upon that court in a 2010 criminal case.[10] The State asked if

_____

[10] In September 2010, Whipkey pled guilty to one count of theft by taking and three counts of violating the Georgia Controlled Substances Act. He entered a negotiated plea under OCGA § 16-13-2 (a), which, when a person who has not previously been convicted of a crime involving possession of controlled substances pleads guilty to possession, allows the trial court to defer further proceedings and

27

knowing that Whipkey lied in court would change her opinion of his truthfulness. Baxter testified that she did not know about this, and "he's never been a liar" and has "always been truthful."

Whipkey argues that he did not open the door to evidence of truthfulness, and the trial court erred in allowing the State to introduce rebuttal evidence of his untruthful character by divulging the contents of the 2010 order.[11] As will be discussed further infra, however, in Division (4) (b), Whipkey later entered this order into evidence. Because Whipkey later entered into evidence the very order that he

place the person on probation without entering a judgment of guilt. Whipkey completed probation and the trial court entered a discharge order. *Whipkey v. State*, 352 Ga. App. 746, 746-747 (835 SE2d 740) (2019). In October 2014 – just prior to Whipkey's trial in the instant case – the trial court voided Whipkey's first offender status in the drug case and vacated the discharge, finding that Whipkey had "committed a fraud upon this [c]ourt" in the drug case because he stated that he had not previously been convicted of felony possession of a controlled substance. In fact, the trial court found, he had been so convicted in Alabama. Whipkey appealed, and on October 30, 2019 – five years *after* the trial court order referring to Whipkey's "fraud on the court" was introduced in the instant case – this Court reversed, finding that the trial court erred in granting the State's motion to set aside the discharge order after Whipkey had completed his sentence. *Whipkey*, 352 Ga. App. at 751 (2).

[11] At trial, Whipkey testified that he understood that pleading as a first offender meant that he had no previous felony convictions, but that he "forgot" about his 1986 conviction. His sister, an attorney, represented him during that plea. He acknowledged that he had some responsibility, while under oath, to tell the court he had previously been convicted of a felony, but testified, "Isn't that y'all's job to look up my background?"

28

now complains the trial court should have prevented the State from asking about, Whipkey "has waived his right to appeal this issue, [and] we note the oft-repeated rule in Georgia that a party can not during the trial ignore what he thinks to be an injustice, take his chance on a favorable verdict, and complain later." (Citation and punctuation omitted.) *Anthony v. State*, 236 Ga. App. 257, 258 (1) (511 SE2d 612) (1999).

4. Whipkey argues that he received ineffective assistance from his trial counsel. We disagree.

> To show that counsel rendered constitutionally ineffective assistance, Whipkey was required to show *both* that his counsel's performance was professionally deficient *and* that but for counsel's unprofessional conduct, there is a reasonable probability [that] the outcome of the proceedings would have been different. . . . The likelihood of a different result must be substantial, not just conceivable. . . . [W]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.

(Citations and punctuation omitted; emphasis supplied.) *Hill v. State*, 291 Ga. 160, 164 (4) (728 SE2d 225) (2012).

Whipkey's trial counsel, who was privately retained, had practiced primarily criminal law since 1997, trying more than 50 felony cases, of which more than 20

were sex cases. Counsel testified that he met with Whipkey more than five times, discussed strategy and evidence with him, and advised him not to testify because he knew the prosecutor and that "she would be a tough person to have to go through cross-examination with." The prosecutor's cross-examination of Whipkey, trial counsel testified, "took out any possible defense."

(a) Whipkey argues that trial counsel rendered ineffective assistance by failing to object to the character evidence admitted under OCGA § 24-4-414.

Trial counsel testified that while he did not want this evidence in front of the jury, he did not object because he believed the State's proffer was sufficient. As discussed in Division 2, the other acts evidence was properly admissible under either Rule 404 (b) or Rule 414. Ultimately, counsel's failure to make a meritless objection does not amount to ineffective assistance of counsel. See *Vonhagel v. State*, 287 Ga. App. 507, 509-510 (2) (b) (651 SE2d 793) (2007).

(b) Whipkey contends that trial counsel harmed his credibility by introducing into evidence the 2010 order referencing Whipkey's fraud on the court during the cross-examination of Whipkey's son.

At the motion for new trial hearing, trial counsel testified unequivocally that he did not believe the 2010 order had any impact on the jury's view of Whipkey's

veracity. Although counsel's testimony on this point at the motion for new trial was not completely clear, counsel did testify that he strategically used the order to "distract" the jury so that they would focus on the fact that Whipkey had pled to the drug charges and actually admitted his wrongs. "When he admitted to something, he admitted to it. He did it," counsel testified. "He didn't do this [the sex crimes], and I'll prove it to you."

In its order denying Whipkey's motion for new trial, the trial court found that after examining the evidence of counsel's performance, it found that counsel was well-prepared, his strategy was reasonable, and his testimony was credible. "We will not disturb the trial court's credibility determinations." *Browder v. State*, 294 Ga. 188, 194 (4) (751 SE2d 354) (2013). Further, we need not decide whether counsel was constitutionally deficient in introducing into evidence the 2010 trial court order because Whipkey has failed to show prejudice. The detailed testimony of the two victims; the testimony from the other acts witnesses, who had experienced strikingly similar interactions with Whipkey in some regards; and, significantly, Whipkey's own testimony and his social media messages to the victims, taken together, provided strong evidence of his guilt. Whipkey has not shown that, absent the admission of the 2010 order, the result of his trial would have changed the result of his trial. See *Oliver*

31

*v. State*, 364 Ga. App. 828, 842 (4) (c) (ii) (876 SE2d 34) (2022) (finding no prejudice and thus no ineffective assistance despite admission of testimony and photographs showing defendant lied about his military service, which was not directly related to the crimes at issue, because "the other evidence of [defendant's] guilt was compelling").

(c) Whipkey asserts that he received ineffective assistance because counsel did not object to the State's intentional solicitation of evidence that Whipkey used a racial slur. The State questioned other acts witness G. about various occasions when Whipkey gave her alcohol or rides in the middle of the night in exchange for her underwear. She testified that on one occasion, she gave him a friend's dirty underwear. The prosecutor asked:

Q: What did he tell you about that pair of underwear?

A: He said that they were gross and that they must have been a black girl's.

Q: Okay. Is that the words he used?

A: No.

Q: What words did he use?

A: He used the word, "n-gger."

Q: And what did he say when he used that word?

32

A: He said, Are these a n-gger's underwear? I almost threw up.

Whipkey argues that the prosecutor's solicitation of the racial slur was not relevant and only inflamed the jury, and that counsel was ineffective failing to object in some way. Whipkey cites no legal authority to support his contention of error.

At the motion for new trial hearing, counsel at first testified that he did not recall that testimony and could not think of a strategic reason why he did not object. He later testified as to a strategy, however: "I don't want to highlight any racial issues and me jumping up like a jack-in-the-box objecting . . . would draw more highlights to it. If I just sit down, it's just going to go – go over. Hopefully, the jury won't even see it."

> We are not limited in our assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel for his conduct. If a reasonable lawyer might have done what the actual lawyer did – whether for the same reasons given by the actual lawyer or different reasons entirely – the actual lawyer cannot be said to have performed in an objectively unreasonable way.

(Citations and punctuation omitted.) *Cobb v. State*, 348 Ga. App. 210, 214 (2) (b) (820 SE2d 241) (2018); see *Griffin v. State*, 309 Ga. 860, 867 (3) (849 SE2d 191) (2020) (finding no ineffective assistance where counsel stated a reasonable strategy

33

regarding his decision not to object to evidence of his client's racism). Trial counsel also testified that this was the only mention of the epithet at trial. See *Jones v. State*, 364 Ga. App. 490, 495-496 (2) (a) (875 SE2d 465) (2022) ("pretermitting whether this testimony was subject to objection . . . [g]iven the fleeting nature of the testimony . . . it was not objectively unreasonable for counsel to decide the better tactic was not to draw attention to the testimony even if it was objectionable").

5. Whipkey avers that the trial court erred in denying his motion for a continuance to seek new counsel, amounting to structural error because it effectively denied his Sixth Amendment right to his choice of counsel. We disagree.

> Motions for continuance based on insufficient time to hire or substitute trial counsel are addressed to the sound discretion of the trial court, and the trial court's ruling will not be reversed absent an abuse of discretion. The trial court may consider the conduct of a party in order to prevent a party from using the employment of counsel as a dilatory tactic. The party requesting the continuance must show that he exercised due diligence.

*Turner v. State*, 247 Ga. App. 775, 779 (5) (544 SE2d 765) (2001). Whipkey's trial date was specially set for November 10, 2014. On October 31, 2014, during a hearing at which Whipkey was present, Whipkey's counsel told the trial court that after

34

reviewing a jail telephone log and archived visit report he had retrieved from the State that morning as part of discovery,

> I think Mr. Whipkey intends to fire me or expects to fire me. And I think that needs to be put on the record because this case is specially set for November 10th. And what I don't want to happen, and I'm sure the [c]ourt doesn't want to happen, is to show up on November the 10th and Mr. Whipkey come out and try to fire me . . .."

Whipkey's counsel told the judge that the jail visitor report showed a "professional" visit from Whipkey's sister, an attorney, during the time that trial counsel was representing Whipkey. Counsel also told the judge the jail calls indicated attempts to influence a witness, and that counsel now felt if he provided information to family or witnesses, he could be risking his bar license or felony witness tampering charges. He told the trial court that although he had been close to moving to withdraw, he planned to try the case on November 10 unless Whipkey took his advice and accepted the State's plea offer.

Whipkey did not move for a continuance to seek new counsel at the October 31 hearing. Rather, during a pre-trial hearing on November 7, one business day before trial, Whipkey asked to address the court, and was sworn. He said that he and his counsel had a conflict of interest; that counsel had violated attorney-client privilege,

35

but offered no details; that on October 31, he asked counsel in front of a court deputy if counsel would "try to win my case for the $20,000 I gave him[,]" and that counsel said he would not refund the money and "was going to watch me lose . . . [and get] three life sentences plus 40 years." Whipkey mentioned counsel's statement at the October 31 hearing that he nearly withdrawn from representation, and told the court that counsel had not visited him in jail and did not hire an investigator to depose key witnesses. Whipkey asked for a continuance "until I get a different pay lawyer who will show my innocence."

Immediately after the trial court denied Whipkey's request for a continuance, Whipkey told the court that he had fired counsel on October 31 – eight days prior to his continuance request. The trial court asked if Whipkey wanted to represent himself or retain another lawyer "understanding that they will have nothing but the weekend to prepare for the case?" Whipkey said, "I will go with another lawyer on Monday." The trial court responded, "All right." Whipkey then told the court he had two lawyers who would represent him if he got a continuance. The court responded, "[Y]ou're not getting a continuance. . . . [D]o you have a lawyer who's prepare to represent you on Monday[?]" Whipkey said no. After consulting with his client,

counsel told the court, "I think we're fine to go forward." Whipkey echoed, "We're fine."

To the extent that Whipkey has not waived this enumeration by conceding that he was "fine" with trial as scheduled, we find no abuse of discretion.

As the trial court found in its order, Whipkey failed to show "due diligence." *Turner*, 247 Ga. App. at 779 (5); OCGA § 17-8-20. Other than Whipkey's averments about counsel's statements on October 31, Whipkey did not explain why he waited until, essentially, the day before trial to request a continuance, and made no showing that he "did not know and could not have known" or acted upon his other concerns at an earlier point. See *Westmoreland v. State*, 281 Ga. App. 497, 498 (1) (636 SE2d 692) (2006) (finding no abuse of discretion in denial of continuance where defendant failed to show "that he did not know and could not have known earlier the same information he gave counsel on the morning of trial."). "[W]hile every defendant has the right to hire counsel, a defendant must use reasonable diligence in obtaining retained counsel. A defendant may not use a request for change of counsel as a dilatory tactic." (Citation and punctuation omitted.) *Lane v. State*, 299 Ga. 791, 794 (2) (792 SE2d 378) (2016); see generally *Kollie v. State*, 301 Ga. App. 534, 543 (8) (687 SE2d 869) (2009) (finding no error where trial court denied defendant's request

37

to replace his counsel despite defendant's contention that counsel "did not have his best interest at heart, screamed at him and insulted him, lied to him" because defendant failed to show that counsel "could not provide him effective representation"). We find no abuse of discretion.

6. Finally, Whipkey argues that the cumulative prejudicial effect of the trial court's evidentiary errors, along with his counsel's deficient performance, warrants a new trial.

> To establish cumulative error a defendant must demonstrate that at least two errors were committed in the course of the trial and considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial. When considering the cumulative effect of presumed errors by trial counsel and the trial court, this Court considers collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel. Here, Appellant's claim fails because Appellant has not demonstrated that the prejudicial effect of the assumed trial court errors and ineffective assistance denied him a fundamentally fair trial, given the strong evidence against him[.]

(Citations and punctuation omitted.) *Huff v. State*, – Ga. – (6) (– SE2d – (6)) (Feb. 7, 2023) (2023 Ga. LEXIS 1, *19 (6), 2023 WL 1786083, *7 (6)).

*Judgment affirmed. Barnes, P. J., and Brown, J., concur.*